UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ADAM ELEND, et al.,

        Plaintiffs,

v.                       CASE No. 8:03-CV-1657-T-TGW

SUN DOME, INC., et al.,

        Defendants.

_____

O R D E R

        The plaintiffs in their verified second amended complaint seek, pursuant to 42 U.S.C. 1983, money damages, injunctive and declaratory relief, attorney's fees and costs against Sun Dome Inc., and the University of South Florida ("USF") Board of Trustees based upon the plaintiffs' arrests for protesting at a political event held at the Sun Dome. This relief is foreclosed, as the Sun Dome and the Board of Trustees argue in a motion for summary judgment, due to Eleventh Amendment immunity (Doc. 79). The Sun Dome also correctly asserts that it cannot be held liable under §1983 because it does not have a policy or custom that deprived the plaintiffs of their constitutional rights.

After the motion for summary judgment was argued, the plaintiffs filed a motion to amend the second amended complaint (Doc. 98). For several reasons, the belated motion will be denied.

.                                I.

On November 2, 2002, the plaintiffs, Adam Elend, Jeff Marks and Joe Redner, were arrested for protesting during an event held for Governor Jeb Bush at USF's Sun Dome (Doc. 53-1, p. 4, ¶11; p. 9, ¶30). President George W. Bush made an appearance at that event.  Desiring to communicate political messages to the event's attendees, the plaintiffs placed themselves on a median adjacent to a parking lot of the Sun Dome, and Marks and Redner held placards (id. at p. 7, ¶¶ 23, 24; p. 8, ¶25).

The plaintiffs allege that officers from the USF police department told them that they could not protest on the median, but that they were required to move to a designated area known as the "First Amendment [z]one" (id. at p. 8, ¶26; p. 9, ¶29).  The plaintiffs did not relocate, but asserted to the officers their right to protest at that location.  Kelly Hickman, a Sun Dome

employee, also approached the plaintiffs and requested the plaintiffs to move to the area designated for demonstrators (id. at p. 9, ¶29).[1]

The plaintiffs still refused to move.  Hillsborough County Sheriff's deputies then arrested them for "trespass after warning" in violation of §810.09, Fla. Stat. (id. at p. 9, ¶30).  This charge was subsequently dismissed in Hillsborough County Court on the ground that no agent of the Sun Dome had the requisite authority to issue a trespass warning to the plaintiffs (id. at p. 12, ¶44; Doc. 53-6, Ex. C).

The plaintiffs, on August 5, 2003, filed a complaint against Sun Dome, Inc., the USF Board of Trustees, Cal Henderson (in his official capacity as Sheriff of Hillsborough County) and W. Ralph Basham (in his official capacity as director of the United States Secret Service), seeking a declaratory judgment, injunctive relief, damages, attorney's fees and costs (Doc. 1).  Defendant Basham filed a motion to dismiss on the ground that the court lacked subject matter jurisdiction because the plaintiffs did not have standing to seek the relief requested (Doc. 15).  Subsequently, an Order was entered granting defendant Basham's motion based on the complaint's failure

---

[1]Her surname is spelled "Hitchman" in a Hillsborough County Court Order (Doc. 53-6, Ex. C).

"to allege that the plaintiffs desire to engage further in the type of activities that are the subject of this action" (Doc. 52).  The plaintiffs, however, were granted leave to amend the complaint.

The plaintiffs filed a verified second amended complaint that alleges that they were denied their constitutional right to protest (Doc. 53).[2] The Secret Service filed another motion to dismiss, asserting that the court lacked jurisdiction because the plaintiffs did not have standing and because their claims were not ripe (Doc. 60).  This motion was granted, and the Secret Service was dismissed from the case (Doc. 88).

With respect to the USF Board of Trustees and the Sun Dome, the plaintiffs seek a declaratory judgment that in essence finds the defendants' actions to be in violation of the plaintiffs' rights under the First, Fifth and Fourteenth Amendments of the Constitution, an injunction preventing the defendants from restricting the plaintiffs to designated protest zones at future public events, money damages, attorney's fees and costs (Doc. 53, p. 16, ¶61; p. 17, ¶¶ 65, 67; p. 18).  Defendants Board of Trustees and the Sun Dome filed a motion for summary judgment, contending that they have Eleventh

---

[2]Cal Henderson, as Sheriff, was not named as a defendant in the verified second amended complaint.

Amendment immunity that forecloses the plaintiffs' claims in this court, that the Sun Dome does not have a policy or custom that deprived the plaintiffs of their constitutional rights, and that the plaintiffs lack standing to seek prospective relief (Doc. 75-1). After the plaintiffs responded (Doc. 86-1), oral argument was heard on the motion.

## II.

The court shall enter summary judgment only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c). Material facts are those over which disputes "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the [opposing] party." Id. The movant bears the burden of establishing the absence of a dispute over material facts. Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469 (11th Cir. 1993).

When the party moving for summary judgment has the burden of proof at trial on a claim or contention, it must affirmatively show the absence of a genuine issue of material fact by presenting credible evidence that would

entitle it to a directed verdict on that claim or contention if the evidence was not controverted at trial.  United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991).  If the moving party does not meet its burden, then the motion for summary judgment will be denied.  Id. at 1437-38. If the movant  meets its initial burden, then it is entitled to summary judgment unless the opposing party comes forward with "significant probative evidence demonstrating the existence of a triable issue of fact."  Id. at 1438.

When the party moving for summary judgment does not have the burden of proof at trial, that party may discharge its initial burden by identifying specific portions of the record which show the absence of evidence to prove the opposing party's case at trial, or, alternatively, it may come forward with "affirmative evidence demonstrating that the [opposing] party will be unable to prove its case at trial."  Id.  If this burden is not met, then the motion for summary judgment will be denied.  Id.

When the moving party meets its initial burden, the burden then shifts "to the [opposing] party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  If the party opposing the motion is unable to make a sufficient showing on an element essential to its case on which it

has the burden of proof at trial, the movant is entitled to summary judgment.

United States v. Four Parcels of Real Property, supra, 941 F.2d at 1438.

In determining whether the moving party should be awarded summary judgment, the court must view the evidence and factual inferences therefrom in the light most favorable to the opposing party.  Reynolds v. Bridgestone/Firestone, Inc., supra, 989 F.2d at 469.  Any reasonable doubts about the facts are to be resolved in favor of the party opposing the motion for summary judgment.  Id.

III.

Both defendants contend that the plaintiffs' claims are barred by the Eleventh Amendment.  That Amendment "prohibits federal courts from exercising subject matter jurisdiction in suits brought against a state by a citizen of that state."  Schopler v. Bliss, 903 F.2d 1373, 1378 (11th Cir. 1990).  In light of the plaintiffs' irrational response that the logic of the defendants' position would permit all manner of egregious constitutional violations (Doc. 86-1, p. 4), it is appropriate to note that the Eleventh Amendment simply bars suit in federal court.  Thus, "[t]he "Eleventh Amendment largely shields States from suit in federal court without their consent, leaving parties with claims against a State to present them, if the State permits, in the State's own

tribunals." <u>Hess</u> v. <u>Port Authority Trans-Hudson Corp.</u>, 513 U.S. 30, 39 (1994).

The Eleventh Amendment also bars suits in federal court brought against state agents and instrumentalities. <u>Regents of the University of California</u> v. <u>Doe</u>, 519 U.S. 425, 429 (1997). The issue here, therefore, is whether the Board of Trustees and the Sun Dome are entitled to Eleventh Amendment immunity as arms of the state. The factors to consider when deciding if a party has such immunity are: (1) how state law defines an entity; (2) what degree of control the state maintains over the entity; (3) where funds for the entity are derived; and (4) who is responsible for judgments against the entity. <u>Tuveson</u> v. <u>Florida Governor's Council on Indian Affairs, Inc.</u>, 734 F.2d 730, 732 (11th Cir. 1984).

Even though these factors are well-established in Eleventh Circuit jurisprudence and were discussed at length in the defendants' memorandum, the plaintiffs did not address them at all in their memorandum or at the hearing. Nevertheless, despite the plaintiffs' implicit concession that the Board of Trustees and the Sun Dome are arms of the state, they will be evaluated under the settled criteria, albeit somewhat succinctly.

A.  Board of Trustees

### 1. How Florida law defines the Board

The Florida Legislature under §1001.72(5), Fla. Stat., has defined boards of trustees for universities as "corporations primarily acting as instrumentalities or agencies of the state, pursuant to s. 768.28(2), for purposes of sovereign immunity."  In turn, §768.28(2), Fla, Stat., includes state university boards of trustees as state agencies or subdivisions.[3]

### 2. The degree of Florida's control over the Board

Florida's authority over the appointment of Board members lends support to the conclusion that the Board is an arm of the state for Eleventh Amendment purposes.  See Miccosukee Tribe of Indians of Florida v. Florida State Athletic Commission, 226 F.3d 1226, 1233 (11th Cir. 2000); see also Fouche v. Jekyll Island-State Park Authority, 713 F.2d 1518, 1520 (11th Cir. 1983) (noting that the Governor appoints four of the Park Authority's members).  The Governor of Florida appoints six of the thirteen members of the Board and those appointments must be confirmed by the Florida Senate.

---

[3]Pursuant to Fla. Const. Art. IX, §7(b), "[t]here shall be a single state university system comprised of all public universities.  A board of trustees shall administer each public university and a board of governors shall govern the state university system."

§1001.71(1), Fla. Stat.  Five of the members are appointed by the Board of Governors and also must be confirmed by the Senate.  Id.[4]

Furthermore, §1001.74, Fla. Stat., outlines the Board's duties and demonstrates that the state has control of the Board's authority.  For example, "[n]o bureau, department, division, agency, or subdivision of the state shall exercise any responsibility and authority to operate any state university except as specifically provided by law or rules of the State Board of Education." §1001.72(4), Fla. Stat.  The Board implements and maintains educational programs "within law and rules of the State Board of Education." §1001.74(1), Fla. Stat.  Similarly, the Board of Trustees governs USF, but it must do so "in accordance with law and with rules of the State Board of Education."  §1001.74(2), Fla. Stat. In short, the Board must operate in accordance with the State Board of Education's guidelines.

3.  Where the Board's funds are derived

Submission of a budget to the state shows that the Board is an instrumentality of the state because it demonstrates that the state has control over the Board's fiscal life.  Miccosukee Tribe of Indians of Florida v. Florida

---

[4]Defense counsel stated at the hearing that the other two positions are held by the president of the students of USF and the president of the faculty senate (Doc. 94, pp. 6-7). This means that there is one student and one faculty member on the Board of Trustees (id.).

State Athletic Commission, supra, 226 F.3d at 1233; Fouche v. Jekyll Island-State Park Authority, supra.  The Board has to submit its institutional budget request, request for fixed capital outlay and an operating budget to the State Board of Education for approval. §1001.74(12), Fla. Stat.  Furthermore, the Board must "account for expenditures of all state, local, federal, and other funds in the manner described by the Department of Education." §1001.74(13), Fla. Stat.

    4.  Who is responsible for judgments against the Board

A state's financial liability for a judgment entered against an entity is an important consideration in determining whether it is an arm of the state.  Regents of the University of California v. Doe, supra, 519 U.S. at 904. Thus, a court must consider whether a judgment "would implicate the state treasury...." Shands Teaching Hospital and Clinics, Inc. v. Beech Street Corp., 208 F.3d 1308, 1311 (11th Cir. 2000).

Here, the Board has coverage for lawsuits under the State Risk Management Trust Fund.  §1001.72(3), Fla. Stat.  Consequently, Florida would be liable for a judgment rendered under §1983 against the Board through Florida's Risk Management Trust Fund. Miccosukee Tribe of Indians of Florida v. Florida State Athletic Commission, supra, 226 F.3d at 1234; see

also §284.30, Fla. Stat.[5]  This determination is not altered by the fact that what is involved is a self-insurance program.  Miccosukee Tribe of Indians of Florida v. Florida State Athletic Commission, supra, 226 F.3d at 1233.

In sum, all four factors support the conclusion that the Board of Trustees is an arm of the state of Florida.  This conclusion is buttressed by determinations that USF is an arm of the state.  Tang v. University of South Florida, 2005 WL 2334697 (M.D. Fla. 2005); Boles v. Gibbons, 694 F.Supp. 849 (M.D. Fla. 1988).  It is also consistent with rulings that the former Board of Regents was a state agency.  Board of Regents v. Snyder, 826 So.2d 382, 387 (Fla. App. 2002); Biggs v. State of Florida Board of Regents, 1998 WL 344349 (N.D. Fla. 1998).  Therefore, the Board of Trustees is entitled to Eleventh Amendment immunity.

B.  Sun Dome

The Sun Dome is not directly controlled by  Florida, but rather by USF, which, as indicated, is an arm of the state.  An evaluation of the pertinent four factors confirms that the Sun Dome is also an arm of the state.

---

[5]Pursuant to §284.30, Fla. Stat., "[a] state self-insurance fund, designated as the 'State Risk Management Trust Fund,' is created to be set by the Department of Financial Services and administered with a program of risk management, which fund is to provide insurance, as authorized by s. 284.33, for ... federal civil rights actions under 42 U.S.C. s. 1983 or similar federal statutes..."

The plaintiffs, as previously mentioned, have made no attempt to show otherwise.

          1.  <u>How Florida law defines the Sun Dome</u>

          The Sun Dome was established as a not-for-profit corporation by USF mainly to manage the Sun Dome arena (Doc. 75-2, Ex. 1, pp. 1-2, ¶2). According to Michael LaPan, the Sun Dome's current executive director, the Sun Dome is a Florida university direct-support organization under §1004.28(1)(a), Fla. Stat. (<u>id</u>. at p. 3, ¶11).

          That statute states:

> "'University direct-support organization' means an organization which is: 1. A Florida corporation not for profit incorporated under the provisions of chapter 617 and approved by the Department of State. 2. Organized and operated exclusively to receive, hold, invest, and administer property and to make expenditures to or for the benefit of a state university in Florida...."

The defendants' characterization of the Sun Dome as a direct-support organization is bolstered by the language contained in a Memorandum of Understanding that was entered into between USF and the Sun Dome on January 1, 1998 (Doc. 75-3, Ex. A to Ex. 2).  Under that agreement, the Sun Dome was organized to "[o]perate, and administer for and on behalf of the

University of South Florida (the "University"), certain facilities located on the campus of the University in Hillsborough County, Florida, as designated by the University, for the conduct of University activities, events and entertainment on behalf of the University's students, faculty and staff ..." (id. at Ex. B to Ex. 2, p. 2).[6]  Furthermore, the Sun Dome also "engage[s] solely in activities which exclusively support and benefit the University, the Board of Regents of the State of Florida and the State of Florida" (id. at pp. 2-3).[7] Merely because the Sun Dome is a not-for-profit corporation (although one controlled by the university) does not alter the conclusion that the Sun Dome is an arm of the state.  See Shands Teaching Hospital and Clinics, Inc. v. Beech Street Corp., supra, 208 F.3d at 1311 (private corporation, acting as agent of the state, was entitled to Eleventh Amendment immunity); Tuveson v. Florida Governor's Council on Indian Affairs, Inc., supra, 734 F.2d 730 (holding Council on Indian Affairs that was created as a non-profit

---

[6]The facilities that are a part of this agreement are USF Sun Dome, USF Golf Course and Practice Range, USF Stadium and Soccer Practice Field, Red McEwen Field (USF Baseball Stadium), Varsity Tennis Facility, Varsity Softball Field, and Sun Dome Auxiliary Gymnasium (Doc. 75-3, Ex. A to Ex. 2,  Amendment No. 2).

[7]As noted, the Board of Regents is no longer in existence (Doc. 79, pp. 5-6; see also Fla. Stat. Const. Art. IX, §7(b)).

corporation to "carry[ ] out a governmental, not a proprietary, function," was entitled to Eleventh Amendment immunity).

2.  The degree of  control over the Sun Dome

The state, through USF, a state agency, has control over the Sun Dome.  Thus, the Sun Dome must make the facilities available to the university when directed by USF's president or her designee (Doc. 75-3, Ex. B to Ex. 2, p. 2).  The Sun Dome must also  permit the internal auditors of USF and legislative auditors of the state to "audit, inspect, examine and copy any and all [of Sun Dome's] books, papers, reports, correspondence, memoranda, cash register records and other records of [Sun Dome] which are pertinent" to the Memorandum of Understanding (id. at Ex. A to Ex. 2, p. 9).  See Fouche v. Jekyll Island-State Park Authority, supra, 713 F.2d at 1520-21 (defendant's submission of budget to state auditor supported that it was an arm of the state).

Further, the university exerts other controls over the facilities that the Sun Dome oversees.  For example, USF has to right to make unannounced inspections of the facilities (Doc. 75-3, Ex. A to Ex. 2, p. 14), and  the right to physically inventory the equipment, furnishings and materials to ensure that the actual inventories correspond with the records (id. at p. 9).  Prior to

making any structural alterations or substantial physical changes in the facilities, the Sun Dome must have USF's advance written approval (id. at p. 25). USF must approve vending machines, coin-operated music playing devices or coin-operated games before the Sun Dome can place them in facilities (id. at p. 14).

In addition, the university controls the Sun Dome's board of directors. For example, USF's president appoints the members of the Sun Dome's board of directors (id. at Ex. C to Ex. 2, pp. 5, 8). Many of the directors on the board are personnel of the university, and the board must include the vice president for administrative affairs, the vice president for student affairs, the dean of the college of fine arts, the athletic director, and USF's General Counsel (id. at p. 8). Moreover, USF's president may remove those directors that she has appointed, with or without cause (id. at p. 5).

Similarly, USF has control over the Sun Dome's officers. USF's president must concur before the Sun Dome's board of directors removes an officer (id. at p. 14). USF's president also recommends and approves the president of the Sun Dome, who is formally appointed by the board of directors (id. at p. 12). USF also has "the right to require a change of personnel without recourse or explanation" (id. at Ex. A to Ex. 2, p. 16).

Significantly, this does not exhaust the list of the ways in which the university has control over the Sun Dome.

3.  <u>Where the Sun Dome's funds are derived</u>

The Sun Dome is a component unit of USF's Board of Trustees (Doc. 75-2, Ex. 1, p. 3, ¶12).  Therefore, each fiscal year, the Sun Dome's budget is reported as part of the Board's state financial statements (<u>id</u>.).

The university also oversees the Sun Dome's fiscal circumstances.  After each fiscal year, the Sun Dome must give to USF's president a balance sheet of its financial condition and an income and expense statement of its operations (Doc. 75-3, Ex. C to Ex. 2, p. 20).  Also, "[n]ot less than quarterly," the Sun Dome must give its budget and expenditure plans to USF's president (<u>id</u>. at p. 21).  Moreover, the Sun Dome's operating budget is submitted to the Board of Trustees (Doc. 94, p. 9).

The duties of USF's president include monitoring and controlling the Sun Dome's use of university resources, recommending an annual budget, reviewing and approving expenditures, and approving the Sun Dome's employees' salaries, other compensation and benefits (Doc. 75-3, Ex. C to Ex. 2, p. 21).  USF also pays the costs for various utilities for some facilities that are subject to the Memorandum of Understanding, including the Sun Dome

-17-

facility, USF stadium and soccer practice fields, the varsity tennis facility, and the varsity softball field (id. at p. 21).

In addition, the Sun Dome also "dedicates all assets which it may acquire" for its corporate purpose, which is to benefit USF (id. at Ex. B to Ex. 2, p. 10).

4.  Who is responsible for judgments against the Sun Dome

As previously explained, USF has the Florida Risk Management Trust Fund to satisfy its judgments.  Similarly, the Sun Dome is covered by the State Division of Risk Management (Doc. 75-2, Ex. 1, p. 3, ¶13). Consequently, the defendants state, without contradiction, that, as a result of the Sun Dome's coverage, "the State treasury may be directly implicated in any judgment against [the] Sun Dome" (Doc. 79, p. 15; see also Doc. 94, p. 11).

In sum, under the four-factor analysis, the Sun Dome is entitled to Eleventh Amendment immunity.  The plaintiffs, as noted, have made no effort to show the contrary.

The only attempt by the plaintiffs to challenge the showing that the Sun Dome is an arm of the state is a passing assertion in their memorandum that someone said the location of their protest was private

property.  Thus, the plaintiffs allege that, on November 2, 2002, they were told that "the Sun Dome was a private corporation and that [the] [p]laintiffs had no right to remain on Sun Dome's private property" (Doc. 86-1, p. 2). The plaintiffs, however, have not come forward with any evidentiary support establishing that such a statement was made and that the person who said it knew what he or she was talking about.  Consequently, the unsupported allegation cannot provide a basis for concluding that the Sun Dome is not an arm of the state.  In all events, at the hearing, defense counsel clarified that the plaintiffs were on USF's property, and having been to that area numerous times, I could take judicial notice that it is the university's property since it is in the middle of USF's campus.  See Rule 201(b), F.R.E.  Accordingly, the plaintiffs have not produced any evidence, or any legal argument, indicating that the Sun Dome is not an arm of the state.

The plaintiffs' challenge to the application of the Eleventh Amendment, rather, is the astonishingly erroneous contention that that Amendment must yield to the First and Fourteenth Amendments.  Thus, the plaintiffs assert that "[t]he real question here is whether the Eleventh Amendment trumps the First Amendment and all other express fundamental rights identified in the Constitution and applied to states via the Fourteenth

Amendment" (Doc. 86-1, p. 4).  This assertion fails to understand that the Eleventh Amendment does not conflict with any fundamental rights established in the Constitution, but simply limits the forum in which those rights can be vindicated.   See Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 98-100 (1984).  Accordingly, the Eleventh Circuit has stated that "[t]he Fourteenth Amendment does not by its own force override the States' Eleventh Amendment immunity."  Schopler v. Bliss, supra, 903 F.2d at 1379 n.4.  While Congress, pursuant to the Fourteenth Amendment, could abrogate the states' Eleventh Amendment immunity, Pennhurst State School and Hospital v. Halderman, supra, 465 U.S. at 99, there is no contention here that Congress has done so, and, in any event, an argument that §1983 has accomplished that abrogation would be unavailing. Quern v. Jordan, 440 U.S. 372 (1979).

The plaintiffs, therefore, have not provided any plausible basis for finding that the Board of Trustees and the Sun Dome are not arms of the state and thus entitled to Eleventh Amendment immunity.  This conclusion unquestionably bars the plaintiffs' claim for money damages.  Regents of the University of California v. Doe, supra, 519 U.S. at 429.

-20-

The plaintiffs seek to salvage something from this lawsuit through their claims of injunctive and declaratory relief.  In this respect, the plaintiffs rely upon Ex Parte Young, 209 U.S. 123 (1908).  In Ex Parte Young, supra, 209 U.S. at 159, the Supreme Court held that an injunction may be entered against a state officer acting in his official capacity to prevent him from doing an unconstitutional act.  Consequently, the Eleventh Amendment does not bar a citizen of a state from seeking injunctive relief against a state actor in federal court to force the actor to comply with federal law.

For two reasons, however, Ex Parte Young provides no assistance to the plaintiffs in their request for injunctive and declaratory relief.  In the first place, in order to avoid Eleventh Amendment immunity by a request for injunctive or declaratory relief, a plaintiff must name individual state officials as defendants in the lawsuit.  Stevens v. Gay, 864 F.2d 113, 115 (11th Cir. 1989).  It is not enough to sue an entity of the state that is comprised of board members.  Id.; Schopler v. Bliss, supra, 903 F.2d at 1378-79.  In this case, the plaintiffs in their second amended complaint have not named as defendants any individual state officials.  Consequently, the claim for injunctive and declaratory relief is barred by the Eleventh Amendment.

The second reason that the plaintiffs' claim for injunctive and declaratory relief does not save this lawsuit is that the plaintiffs lack standing to assert a claim for such prospective relief.  The principles regarding standing have been set forth in the earlier Order concerning the Secret Service, and they apply here as well (see Doc. 88, pp. 7-9).  For essentially the same reasons previously stated, the plaintiffs lack standing to seek prospective relief against the Board of Trustees and the Sun Dome.  Moreover, the defendants have come forward with additional evidence, which the plaintiffs have not contradicted, that provides a compelling showing of lack of standing.

As previously explained, a plaintiff seeking injunctive or declaratory relief must prove not only an injury, but also a real and immediate threat of future injury in order to satisfy the injury-in-fact requirement. Koziara v. City of Casselberry, 392 F.3d 1302, 1305 (11th Cir. 2004).  "When a plaintiff cannot show that an injury is likely to occur immediately, the plaintiff does not have standing to seek prospective relief even if he has suffered a past injury." 31 Foster Children v. Bush, 329 F.3d 1255, 1265 (11th Cir. 2003), cert. denied, 540 U.S. 984 (2003).

The plaintiffs patently have failed to show any threat of imminent injury with respect to an event at the Sun Dome.  Thus, there presently are no

plans for President Bush to appear at the Sun Dome (Doc. 75-2, Ex. 1, p. 3, ¶9; Doc. 75-4, Ex. 3, p. 3, ¶10).

Furthermore, the rally on November 2, 2002, is the only time a demonstration area was placed in Fowler Field (Doc. 75-2, Ex. 1, p. 3, ¶7; p. 4, ¶15; p. 3, ¶¶ 7, 15; Doc. 75-4, Ex. 3, p. 3, ¶7).  Other Presidents, namely, Jimmy Carter, Ronald Reagan and George H.W. Bush, have appeared at the Sun Dome and the demonstration areas were set up "immediately adjacent to the Sun Dome" (Doc. 75-2, Ex. 1, p. 3, ¶8).  Michael LaPan, the executive director, explained that, on this one occasion, the Secret Service, because of security concerns, wanted to have a backup motorcade available for President Bush and to locate that backup motorcade outside of Exit No. 4 of the Sun Dome, which is the area where demonstrators have previously been permitted to gather (id. at p. 2, ¶¶ 5, 6).  Consequently, there is no reason to think that a President will appear at the Sun Dome in the future and that, if one does, demonstrators will not be permitted to gather at a location adjacent to the Sun Dome.

The plaintiffs therefore cannot show a real and immediate threat of future injury.  Accordingly, they lack standing to seek injunctive and declaratory relief.  Consequently, for this reason also, the plaintiffs cannot

avoid the defendants' Eleventh Amendment immunity by a claim for injunctive or declaratory relief.

In sum, the defendants have shown that they are entitled to Eleventh Amendment immunity as arms of the state. The plaintiffs have not countered that showing in any meaningful way. Under the circumstances presented here, the defendants' immunity forecloses not only the plaintiffs' claim for money damages, but also their claim for injunctive and declaratory relief. The second amended complaint shall therefore be dismissed.

IV.

The Sun Dome, apparently as a fall-back position, argues that the plaintiffs will not be able to prove that it committed a constitutional violation that is actionable under §1983. Importantly, this argument, under the principles governing motions for summary judgments, requires the plaintiffs to come forward with probative evidence indicating that they can prove a constitutional violation. The plaintiffs have clearly failed to make the necessary showing, as is reflected by the one-page response to the argument and which response contains no citations to any evidence in the record.

Assuming that the Sun Dome is not a state agency, but is a corporation subject to liability under §1983, it nevertheless cannot be held

liable on a theory of respondeat superior or vicarious liability.  Buckner v. Toro, 116 F.3d 450, 452 (11th Cir. 1997), cert. denied, 522 U.S. 1018 (1997); Harvey v. Harvey, 949 F.2d 1127, 1129 (11th Cir. 1992).  Rather, for the Sun Dome to be responsible under §1983, it must have a policy or custom that caused the plaintiffs' injury.  Board of the County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 403 (1997); Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 694 (1978); McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004); Grech v. Clayton County, Georgia, 335 F.3d 1326, 1329 (11th Cir. 2003).  A policy is an officially promulgated policy.  Grech v. Clayton County, Georgia, supra. A custom is "a practice that is so settled and permanent that it takes on the force of law."  McDowell v. Brown, supra, 392 F.3d at 1290 (internal citations omitted).  Therefore, "it is generally necessary to show a persistent and wide-spread practice."  Id.  Normally, isolated incidents do not create liability, id., although a single incident can establish a policy.  Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986).  These principles ensure that an entity is liable only for those deprivations resulting from decisions of its duly constituted legislative body or of those officials whose acts may fairly be said

to be those of the entity.  <u>Board of the County Commissioners of Bryan County, Oklahoma</u> v. <u>Brown</u>, <u>supra</u>, 520 U.S. at 403-04.

It is doubtful that the plaintiffs have even adequately alleged that the Sun Dome has a policy or custom that violates the Constitution.  They certainly have not come forward with any evidence of one.

With respect to count I, which asserts a First Amendment violation, the plaintiffs appear to allege merely that, aside from the events of November 2, 2002, "[i]n the instance of Sun Dome, Inc. and USF, these other "Protest Zones" have been located in areas contiguous and or adjacent to the Sun Dome...." (Doc. 53-1, p. 6, ¶19).  Notably, the affidavit of LaPan, the Sun Dome's executive director, confirms that, except on this one occasion when the Secret Service wanted to use the adjacent area for placement of a back-up motorcade, demonstrators have been permitted to gather in an area immediately adjacent to the Sun Dome (Doc. 75-2, Ex. 1).  There does not appear to be anything unconstitutional about that approach, and the plaintiffs do not make any argument that there is.

The Sun Dome's customary practice therefore is consistent with the First Amendment.  Moreover, the plaintiffs have not shown that the Sun Dome has adopted any official policy on this matter.  Thus, the plaintiffs have

failed to come forward with any evidence indicating that the Sun Dome has a policy or custom that violates the First Amendment.

With regard to the arrests that are the subject of count II, the plaintiffs do not even allege any specific policy or custom that the Sun Dome has that touches upon arrests. Even more important at this summary judgment stage, the plaintiffs have not come forward with any evidence showing that the Sun Dome has a policy or custom concerning arrests that is unconstitutional.[8]

For these reasons, the plaintiffs have failed to demonstrate that the Sun Dome is subject to liability under §1983 for having an unconstitutional policy or custom. This provides an additional basis for dismissing the Sun Dome from this lawsuit.

## V.

After the hearing on the defendants' motion for summary judgment, at which the deficiencies in the plaintiffs' position became readily

---

[8]The plaintiffs make no attempt to establish that the Sun Dome's policy regarding their arrests was established by the Sun Dome employee who issued the trespass warning. That is understandable since the County Court found that she was not authorized to issue the warning (Doc. 53-6, Ex. C, p. 2). Obviously, she could not be an official policymaker for the Sun Dome.

apparent, the plaintiffs filed a motion to amend their complaint.  For several reasons, that motion will be denied.

In the first place, the request comes too late.  It is simply unfair to wait until the discovery cut-off date (and other deadlines) have passed and a motion for summary judgment has been filed and argued, and then seek to revitalize a failing case.

I agree with the defendants, as well as the Sheriff, that those parties will be prejudiced by an expansion of this case at this late date.  In particular, the defendants persuasively argue that they may well have structured their discovery differently if the additional issues and parties had been known earlier.  Further, any new parties that will be added will likely be prejudiced by the fact that more than three years have passed since the incident under consideration.

Importantly, at this point, the governing standard is not just that set out in Rule 15(a), F.R.Civ.P.  Rather, for pleadings to be amended after the Case Management and Scheduling Order, good cause must be shown as required by Rule 16(b), F.R.Civ.P. (Doc. 28, p. 2).  <u>See</u> <u>Sosa</u> v. <u>Airprint</u> <u>Systems, Inc.</u>, 133 F.3d 1417 (11th Cir. 1998).  The plaintiffs have not even acknowledged this standard, much less attempted to meet it.  Good cause is

not shown on the basis of the assertion that this area is very complex and hard to comprehend.   It is not as difficult as the plaintiffs assert and can be understood through basic research.  The plaintiffs' frivolous response to the defendants' Eleventh Amendment argument suggests that such research was not done.  Consequently, good cause has not been shown for an amendment of the complaint at this late stage.

In addition, the proposed amendment is vague and indefinite. There is no specific statement of what claims are to be added, and, except for the Sheriff, there is no identification of the individuals to be joined.  This lack of specification makes it impossible to discern whether the amendment would be futile.  Any additional claims for injunctive and declaratory relief would likely be doomed for lack of standing.  Claims against individuals for money damages would undoubtedly be met with the defense of qualified immunity. In light of these serious problems, the plaintiffs' failure to be more specific concerning their proposed amendments is enough by itself to justify denial of the motion.

In light of all the factors that have been mentioned, an amendment to the complaint is clearly unwarranted.

It is, therefore, upon consideration

ORDERED:

1.   That the Defendants Sun Dome, Inc. and the University of South Florida Board of Trustees' Dispositive Motion for Summary Judgment (Doc. 75) be, and the same is hereby, GRANTED.   The Clerk shall enter judgment in favor of the defendants dismissing the plaintiffs' second amended complaint with prejudice.

2.   That the Plaintiffs' Motion for Leave to File Amended Complaint (Doc. 98) be, and the same is hereby, DENIED.

DONE and ORDERED at Tampa, Florida, this 22nd day of December, 2005.

_Thomas G. Wilson_
THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE
